UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

JACQUELINE BRITT,

                    Plaintiff,

          - against -

MERRILL LYNCH & CO., INC., MERRILL
LYNCH PIERCE, FENNER & SMITH, INC. and
RICHARD JOYCE,

                  Defendants.

————————————————————————x

08 Civ. 5356 (GBD) (JLC)

**Oral Argument Requested**

# MEMORANDUM OF LAW IN SUPPORT OF THE MERRILL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## Table of Contents

                                                                                                                                        **Page**

Table of Authorities ....................................................................................................... ii

Preliminary Statement ...................................................................................................1

Statement of Facts ........................................................................................................3

Argument ...................................................................................................................13

I.      SUMMARY JUDGMENT IS AN APPROPRIATE PROCEDURE FOR
        RESOLVING EMPLOYMENT DISCRIMINATION CLAIMS .........................13

II.     PLAINTIFF'S CLAIMS ALLEGING GENDER DISCRIMINATION WITH
        REGARD TO HER COMPENSATION SHOULD BE DISMISSED ..................14

        A.      Plaintiff Fails to Establish a *Prima Facie* Case of Disparate Pay ............15

                1.      Britt Is Not Similarly Situated To Her Alleged Comparators ......................15

                2.      The Alleged Denial of Accounts Does Not Raise an Inference of
                        Discrimination ...............................................................................18

        B.      Merrill Had Legitimate Reasons for Plaintiff's 2006 and 2007 Bonus
                Amounts and Plaintiff Cannot Show That Merrill's Reasons Are Pretextual .........20

        C.      Plaintiff's Claims Cannot Survive Summary Judgment under the NYCHRL .........22

III.    PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIMS BASED ON HER
        GENDER FAIL ................................................................................................23

        A.      Plaintiff Cannot Impute Joyce's Alleged Conduct to Merrill ..................23

        B.      The Alleged Conduct Is Not Severe or Pervasive ..................................25

        C.      The Alleged Conduct Amounts to Petty Slights and Trivial Inconveniences .........29

IV.     PLAINTIFF'S RETALIATION CLAIMS FAIL ...............................................30

        A.      Merrill Did Not Retaliate Against Plaintiff .........................................30

        B.      Joyce Did Not Retaliate Against Plaintiff ............................................31

V.      PLAINTIFF'S CLAIM OF CONSTRUCTIVE DISCHARGE BASED ON HER
        GENDER MUST BE DENIED ..........................................................................31

Conclusion ................................................................................................................34

## Table of Authorities

## CASES

**Page**

*Augustin v. Yale Club*,
    03 Civ1924 (KMK), 2006 U.S. Dist. LEXIS 67462 (S.D.N.Y. Sept. 15, 2006),
    *aff'd*, 274 Fed. Appx. 76 (2d Cir. 2008) .............................................................28, 29

*Arroyo v. WestLB Admin., Inc.*,
    54 F. Supp. 2d 224 (S.D.N.Y. 1999), *aff'd*, 213 F.3d 625 (2d Cir. 2000) ..................31

*Bandham v. Laboratories Corp. of America*,
    234 F.Supp.2d 313 (S.D.N.Y. 2002).......................................................................17, 18

*Belfi v. Prendergast*,
    191 F.3d 129 (2d Cir.1999)...........................................................................................16

*Bernard v. J.P. Morgan Chase Bank N.A.*,
    08 Civ. 4784 (THK), 2010 U.S. Dist. LEXIS 10195 (S.D.N.Y. Feb. 5, 2010) .............14, 22, 23

*Brady v. Calyon Sec. (USA)*,
    05 Civ. 3470(GEL), 2007 U.S. Dist. LEXIS 92602 (S.D.N.Y. Dec. 17, 2007) ........................19

*Brown v. Henderson*,
    257 F.3d 246 (2d Cir. 2001)..........................................................................................26

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).......................................................................................................13

*Chan v. NYU Downtown Hosp.*,
    03 Civ. 3003 (RMB), 2005 U.S. Dist. LEXIS 40243 (S.D.N.Y. Feb. 14, 2005).......................17

*Chinnici v. Fraas USA, Inc.*,
    Index. No. 109155/08, 2010 NY Misc. LEXIS 2053
    (Sup. Ct. N.Y. Cnty. May 10, 2010) ...........................................................................18

*DeSimone v. JP Morgan/Chase Bank*,
    02 Civ. 7039 (RPP), 2004 U.S. Dist. LEXIS 25621 (S.D.N.Y. Dec. 21, 2004).......................28

*Fahmy v. Duane Reade, Inc.*,
    04 CIV. 1798 (DLC), 2006 U.S. Dist. LEXIS 37703 (June 9, 2006).........................17

*Farias v. Instructional Systs., Inc.*,
    259 F.3d 91 (2d Cir. 2001)......................................................................................25 n.14

*Ferrand v. Credit Lyonnais*,
    02 Civ. 5191(VM), 2003 U.S.Dist. LEXIS 17202 (S.D.N.Y. Sept. 30, 2003),
    *aff'd*, 110 Fed. Appx. 160 (2d Cir. 2004) ...................................................................21

KL3 2767119.12

## Table of Authorities
### (continued)

Page

*Fosen v. N.Y. Times,*
  03 CV 3785 (KMK) (THK), 2006 U.S. Dist. LEXIS 75662 (S.D.N.Y. Oct. 11, 2006)......15, 27

*Fullwood v. Ass'n for the Help of Retarded Children, Inc.,*
  08 CV 6739 (DAB), 2010 U.S. Dist. LEXIS 107713 (S.D.N.Y. Sept. 28, 2010) ....................27

*Galarza v. Am. Home Assurance Co.,*
  99 F.Supp.2d 251 (E.D.N.Y. 2000) .................................................................................25

*Garcia v. N.Y. City Admin. for Children's Servs.,*
  03 Civ. 05271(GBD), 2007 U.S.Dist. LEXIS 71273 (S.D.N.Y. Sept. 26, 2007),
  *aff'd,* 354 Fed. Appx. 476 (2d Cir. 2009) ............................................................26, 30

*Hayles v. Advanced Travel Mngmt Corp.,*
  No. 01 Civ. 100017 (BSJ)(BFE), 2004 WL 26548 (S.D.N.Y. Jan. 5, 2004)...........................32

*Kaur v. N.Y. City Health & Hosp. Corp.,*
  688 F. Supp. 2d 317 (S.D.N.Y. 2010)................................................14, 23, 28, 30, 31

*Lamar v. NYNEX Serv. Co.,*
  891 F.Supp. 184 (S.D.N.Y. 1995) ............................................................................27, 28

*Mandell v. County of Suffolk,*
  316 F.3d 368 (2d Cir. 2003)...........................................................................................16

*Mark v. Mount Sinai Hosp.,*
  85 F.Supp.2d 252 (S.D.N.Y. 2000) ........................................................................16, 17

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792, (1973)......................................................................................................15

*McDowell v. T-Mobile USA, Inc.,*
  04 CV 2909 (DGT), 2007 U.S. Dist. LEXIS 71591 (E.D.N.Y. Sept. 26, 2007),
  *aff'd,* 307 Fed. Appx. 531 (2d Cir. 2009) ......................................................................18

*McGuinness v. Lincoln Hall,*
  263 F.3d 49 (2d Cir.2001)...............................................................................................16

*Mugavero v. Arms Acres Inc.,*
  03 Civ 05724, 2009 U.S. Dist. LEXIS 30431 (S.D.N.Y. March 31, 2009)......................25 n.14

*Nugent v. St. Luke's/Roosevelt Hosp. Ctr.,*
  No. 05 Civ. 5109 (JCF), 2007 U.S. Dist. LEXIS 28274 (S.D.N.Y. Apr. 18, 2007),
  *aff'd,* 303 Fed. Appx. 943 (2d Cir. 2008) ..........................................................28, 31, 32, 33

KL3 2767119.12

**Table of Authorities**
(continued)

**Page**

*Opoku-Acheampong v. Depository Trust Co.,*
    99 Civ. 0774(GBD), 2005 U.S.Dist. LEXIS 16387 (S.D.N.Y. Aug. 9, 2005) ....................19, 20

*Panzarino v. Deloitte & Touche LLP,*
    05 Civ. 8502 (BSJ)(RLE), 2009 U.S. Dist. LEXIS 101209
    (S.D.N.Y. Oct. 29, 2009) ................................................................................................14, 27, 31

*Pa. State Police v. Suders,*
    542 U.S. 129 (2004)........................................................................................................33

*Payton v. City Univ. of New York,*
    453 F.Supp.2d 775 (S.D.N.Y. 2006)........................................................................26

*Quinn v. Green Tree Credit Corp.,*
    159 F.3d 759 (2d Cir. 1998)..........................................................................23, 24, 27, 28

*Ricard v. Kraft Gen. Foods,*
    No. 92 Civ. 2256 (GLG), 1993 U.S. Dist. LEXIS 21062 (S.D.N.Y. Mar. 16, 1993),
    *aff'd,* 17 F.3d 1426 (2d Cir. 1994) ...............................................................................28

*Robinson v. Metro-North Commuter R.R. Co.,*
    94 Civ. 7374 (JSR), 95 Civ. 8594 (JSR), 1998 U.S. Dist. LEXIS 373
    (S.D.N.Y. Jan. 15 1998)........................................................................................25

*Sealy v. Hertz Corp.,*
    688 F. Supp. 2d 247 (S.D.N.Y. 2009)..............................................................16, 22

*Shah v. Wilco Sys., Inc.,*
    27 A.D.3d 169 (1st Dep't 2005) ..................................................................................15

*Shumway v. United Parcel Serv., Inc.,*
    118 F.3d 60 (2d Cir.1997)............................................................................................16

*Sicular v. N.Y.C. Dept. of Homeless Serv.,*
    09 Civ. 0981 (AKH)(AJP), 2010 U.S. Dist. LEXIS 10089 (S.D.N.Y. Feb. 4, 2010) ...............14

*Silberfeld v. ABC Carpet Co., Inc.,* Index No. 104508, 2010 N.Y. Misc. LEXIS 1703
    (Sup. Ct. N.Y. Cnty. Mar. 25, 2010)..................................................................................29

*Sutton v. N.Y. City Transit Auth.,*
    No. 02-CV-1441(RRM)(JO), 2009 U.S.Dist. LEXIS 118309
    (S.D.N.Y. Sept. 30, 2009)..................................................................................26

*Tomka v. Seiler Corp.,*
    66 F.3d 1295 (2d Cir. 1995)..........................................................................................27

iv

**Table of Authorities**
(continued)

Page

*Vazquez-Bonilla v. United Union of Roofers Local 8,*
    No. 08-CV-0101(RRM)(LB), 2010 WL 1005905 (E.D.N.Y. Mar. 17, 2010) ..........................33

*Watson v. Arts & Entm't TV Network,*
    04 Civ 1932 (HBP), 2008 U.S. Dist. LEXIS 24059 (S.D.N.Y. Mar. 26, 2008),
    *aff'd,* 352 Fed. Appx. 475 (2d Cir. 2009) ...................................................................................14

*Weinstock v. Columbia Univ.,*
    224 F.3d 33 (2d Cir. 2000).........................................................................................................13

*Weiss v. Morgan Stanley Inv. Mgmt.,*
    05 CV 3310 (GBD), 2008 U.S. Dist. LEXIS 24400 (S.D.N.Y. Mar. 27, 2008),
    *aff'd,* 345 Fed. Appx. 713 (2d Cir. 2009) ............................................................................15, 22

*Williams v. N.Y. City Housing Auth.,*
    61 A.D.3d 62 (1st Dep't 2009) ............................................................................................23, 30

*Wilson v. N.Y.P. Holdings, Inc.,*
    No. 05 Civ. 10355, 2009 U.S. Dist. LEXIS 28876 (S.D.N.Y. Mar. 31, 2009)....................22, 29

**RULES & STATUTES**

CPLR § 214(2) .....................................................................................................................25 n.15

N.Y.C. Admin. Code § 8-107 ..............................................................................................23, 24

N.Y.C. Admin. Code § 8-502 ..............................................................................................25 n.15

## MEMORANDUM OF LAW IN SUPPORT OF THE MERRILL DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch & Co., Inc. ("Merrill" or the "Firm") respectfully submit this memorandum of law in support of their motion for summary judgment dismissing all of the claims raised in Plaintiff Jacqueline Britt's ("Britt" or "Plaintiff") amended complaint (the "Complaint"). Merrill joins in and adopts the arguments set forth in the motion for summary judgment filed by Defendant Richard Joyce.

### Preliminary Statement

Plaintiff's gender discrimination claims arising under the New York State and New York City Human Rights Laws, based on her compensation and her allegations that she was subjected to a hostile work environment and retaliation, cannot survive summary judgment.

With the expectation that Plaintiff would make a significant contribution to Merrill's Cash Equities Sales Trading business, upon hiring Plaintiff, Merrill agreed to pay her $1.5 million for 2004 and $1.2 million for 2005. Merrill paid her those amounts. Thereafter, in accordance with the parties' agreement, the Firm could decide in its sole discretion to award her a bonus of any amount. Unfortunately, Plaintiff's performance did not meet Merrill's expectations. Plaintiff's performance evaluations with respect to 2006 and 2007 – the two years Plaintiff claims her bonus was tainted by considerations of gender – revealed serious problems concerning Plaintiff's use of the Firm's capital, leadership, collaboration with colleagues, and work ethic. Consequently, her manager – an individual who Plaintiff affirmatively states did *not* discriminate against her – recommended that the Firm decrease her compensation to $950,000 for 2006 and $550,000 for 2007. A few weeks after learning of her 2007 bonus amount, Plaintiff advised the Firm that she would resign. Plaintiff's disagreement with her managers' assessments of her performance and her discretionary bonus amounts simply does not support the burden she must meet to show that Merrill's compensation decisions were tied to gender animus.

1

Plaintiff also cannot meet her burden of proving a hostile work environment based on her gender. While claiming that she was subjected to various sex-based jokes and comments by a co-worker at the Firm – Defendant Richard Joyce – over nearly a four year period, and after receiving training on the Firm's harassment and discrimination policy which offered various avenues for making complaints of discrimination, Plaintiff did not make a complaint to the Firm about any such comments until early 2008. Indeed, Plaintiff made that report after being notified of her unsatisfactory performance and after it became apparent that her compensation would decline. Moreover, by her own account, her report, made in the context of a discussion about her negative performance review and her concern that her co-workers did not like her, included only a few alleged offensive statements by a co-worker. Nonetheless, the Firm investigated her concerns, having a senior executive interview Plaintiff shortly after the initial meeting in which she raised them – and Plaintiff did not provide any details of the alleged harassment. Instead, she told the Firm a few weeks later that she planned to resign. Under such circumstances, any alleged harassment cannot be imputed to Merrill. In any event, the alleged jokes and remarks consist of nothing more than what a reasonable person would consider petty slights or trivial inconveniences.

Plaintiff's retaliation claims – that Merrill reduced her compensation for 2007 and that she was subjected to further offensive comments because of her report in early 2008 – cannot survive. First, she cannot show that Merrill retaliated against her by decreasing her compensation because that decision was made long before she registered any complaint to Merrill. Further, Joyce (the co-worker who allegedly engaged in harassment) could not possibly have retaliated against her simply because he had no knowledge of any complaint she made. Because Plaintiff cannot come forward with evidence – not unsubstantiated allegations and suppositions, but evidence – upon which a trier of fact could find in her favor, the Complaint should be dismissed.

2

Finally, Plaintiff's constructive termination claim must be dismissed because she cannot demonstrate that Defendants engaged in gender-based conduct that was intolerable and so severe that it actually compelled her to resign.

### Statement of Facts[1]

**Background**

Plaintiff was employed at Merrill from in or about June 2004 until she resigned her employment on or about February 28, 2008. (Complaint at ¶ 10; Affirmation of Izabel P. McDonald dated December 16, 2010 ("McDonald Aff.") Ex. A.)[2]  Plaintiff held the title of Director and the position of Sales Trader on the New York Cash Equities Sales Trading Desk (the "Desk"). (Deposition of Jacqueline Britt taken June 8, 2009 ("Britt Dep.") at 47-48, 86-87, McDonald Aff.)

**Discrimination and Harassment Training**

Upon her employment with the Firm, Plaintiff received Merrill's "A Matter of Respect" policy, acknowledged receipt of the policy, and completed training on this policy in December 2004. (A Matter of Respect, Ex. B; List of Trainings Completed, Ex. C; Offer Letter, Ex. D at ML 00196; Affidavit of Nancy van der Ziel dated December 13, 2010 ("van der Ziel Aff.") ¶ 2.)  Moreover, in September 2006, Plaintiff completed two additional training sessions on discrimination and harassment titled "Over The Line." (Ex. C; van der Ziel Aff. ¶ 3.)  Merrill's Matter of Respect policy states that "[e]mployees have the responsibility to alert management to potentially harassing activities. They should report any instances to their manager, Human Resources or the Ethics Hotline immediately." (Ex. B, at ML 00128, ML 00127.)  Both the "Matter of Respect" and the "Over The Line" training programs included information on multiple avenues for reporting possible violations of Merrill's policy. (Ex. C; van der Ziel Aff. ¶¶ 2, 3.)

---

[1] The facts detailed herein are accepted as true for purposes of this motion only.

[2] Unless otherwise indicated, Exhibits referenced herein are attached to the McDonald Aff.

KL3 2767119.12

**Plaintiff's Bonus Guarantees**

Plaintiff signed an offer letter agreement outlining the terms of her employment, including her compensation. (Offer Letter, Ex. D.) The offer letter agreement provided that Plaintiff would receive total compensation (inclusive of salary and bonus) of $1.5 million for 2004 and $1.2 million for 2005.[3] (Ex. D at P106; Britt Dep. at 89-90.) Plaintiff admits that the purpose of the contract was to "induce" her to join Merrill. (Complaint ¶ 13.) After 2005, her bonus amounts were discretionary. (Ex. D at P106, Britt. Dep. at 673-74.)

**Plaintiff's Parental Leave in 2005**

Plaintiff was out of the office on a parental leave of absence from June 2005 until October 2005. (Complaint ¶ 14.)

**Plaintiff's Managers**

Initially, Plaintiff reported to Dante Ferrarie, who was the Head of the Desk. (Britt Dep. at 37-38; Deposition of Michael Stewart taken on November 2, 2009 ("Stewart Dep.") at 20, McDonald Aff.) Sometime around the Spring of 2005, Ferrarie created an additional level of organization on the Desk – he created four "pods" or "turrets." (Britt Dep. at 135, 664-65.) He assigned a pod leader to supervise and evaluate the sales traders in each pod. The pod leaders reported to Ferrarie. (*Id.*) From in or about Spring 2005 until in or about Fall 2006, Plaintiff was supervised by Sylvia Rocco, who was her pod leader. (Britt Dep. at 135.) Around October 2006, Michael Breheney became Plaintiff's pod leader and he remained her pod leader until the end of her employment with Merrill. (Britt Dep. at 136, 664-65; Deposition of Michael Breheney, taken November 3, 2009 ("Breheney Dep.") at 11-12, McDonald Aff.) When Ferrarie separated from Merrill in or about August 2006, the pod leaders began reporting to Brennan Warble, who was Head of Equity Sales Trading for the Americas at that time. (Britt Dep. at 665-66; Breheney Dep.

---

[3] Britt's annual salary during her entire employment period with Merrill was $175,000. (Britt Dep. at 90.)

4

at 12-13; Affidavit of Brennan Warble dated December 15, 2010 ("Warble Aff.") ¶ 2.) Warble, in turn, reported to Michael Stewart, the Head of Global Cash Equities at Merrill. (Stewart Dep. at 5-6, 21.)

Joyce was never Plaintiff's supervisor and had no input into her compensation. (Britt Dep. at 674; Declaration of Richard Joyce, dated December 16, 2010 ("Joyce Decl.") ¶ 5.) During the time Plaintiff was employed with Merrill, Joyce was not responsible for determining the compensation, work assignments, or performance rating of any employee on the Desk. (Joyce Decl. ¶ 5.)

Plaintiff has testified definitively that neither Ferrarie, Breheney, Warble nor Stewart discriminated against her. (Britt Dep. at 349, 360, 534, 469.) She also has made no allegation that Rocco discriminated against her. (Britt Dep. at 569.)

**Plaintiff's Responsibilities**

As an equity sales trader for Merrill, Plaintiff's responsibilities included providing research to the institutional client accounts she covered, soliciting orders from those clients, and assisting those clients with equities trading. (Britt Dep. at 48-50; Stewart Dep. at 15-16.) Plaintiff worked internally at Merrill with position traders, whose role it was to trade the stock for the accounts Plaintiff covered. (Britt Dep. at 82-83.) Britt considered it important to develop good relationships with the position traders at Merrill. (Britt Dep. at 85.)

**Plaintiff's Performance and Compensation in 2006**

On her 2006 cross-evaluation, an evaluation conducted by co-workers chosen by Britt, Plaintiff was ranked in the bottom 4th percentile for all of Global Equities.[4] (Britt 2006 Cross Evaluation, Ex. E.) In addition to cross evaluations, sales traders are ranked by position

---

[4] The Merrill cross evaluation takes into account rater tendencies by calculating a relative average for each score. Relative averages compare the rater's rating of one employee with the rater's rating of other employees and thus provide an assessment of relative performance among peers. (van der Ziel Aff. ¶ 4.)

traders and such information is compiled in Merrill's Sales Trader Rankings.  (Sales Traders 2006
Ranking and Sales Traders 2007 Mid-Year Ranking, Exs. F and I.)  Plaintiff was ranked last out of
62 in the 2006 Sales Trader Ranking.  (Ex. F.)

Plaintiff's supervisor – Michael Breheney – who is not alleged to have
discriminated against Plaintiff, evaluated Plaintiff in 2006.  (Britt Dep. at 349.)  On a scale of 1 to
5, with 5 being the best, Plaintiff received a performance rating of 2.  Breheney's concerns, as
reflected on Plaintiff's performance appraisal, included Plaintiff's increase in the usage of the
Firm's capital[5] (Britt 2006 Performance Review, Ex. G at ML 00136-37), her need to increase
understanding and use of the Firm's technology (Ex. G at ML 00137), her low scores in people
leadership and collaboration (Ex. G at ML 00137-38), and her excessive time out of the office (41
days).[6]  (Ex. G at ML 00137-38.)

Brennan Warble, the Head of Equity Sales Trading for the Americas, in
consultation with and approval of Michael Stewart, determined Plaintiff's 2006 bonus amount.
(Warble Aff. ¶ 3; Stewart Dep. at 29.)  *Plaintiff definitively states that Warble did not discriminate*
*against her.*  (Britt Dep. at 469.)  Moreover, Merrill's policy allowed management to use its
discretion to determine Plaintiff's bonuses after 2005.  (Ex. D at P106 and P111, ¶ 5.)  Warble
considered Plaintiff's bonus amount of $775,000 (or a total compensation award of $950,000) for
her work in 2006 to be appropriate.  (Warble Aff. ¶ 5.)  In 2006, Britt exhibited substandard

---

[5] "Use of capital" describes the situation where a customer wants to purchase a stock that Merrill
does not own.  In that case, Merrill uses its own capital to sell the stock, and Merrill must buy the
stock in the marketplace.  Poor use of capital occurs when a sales trader sells such stock to their
customer at a certain price but later buys stock in the marketplace at a higher price.  (Breheney
Dep. at 39-40.)  It is the responsibility of each sales trader to manage his or her use of capital;
indeed it is a factor by which a sales traders' performance is judged.  (Breheney Dep. at 40.)

[6] Merrill's vacation policy, available to employees on Merrill's "intranet," provided that
employees with the title Director had four weeks of vacation if, like Plaintiff, they had less than 25
years of service.  (Deposition of Nancy van der Ziel, taken November 3, 2009 ("van der Ziel
Dep.") at 3, McDonald Aff.; Merrill Vacation Policy, Ex. T.)

performance in many areas, as reflected in her performance review, cross evaluation and the sales traders ranking. (Warble Aff. ¶ 5.) Warble considered the information referenced in these evaluations in his recommendation as to Plaintiff's 2006 bonus amount. (*Id.* ¶ 5.)

**Plaintiff's Performance and Compensation in 2007**

In 2007 Merrill's cross-evaluations used a "decile" scale, with the 1st decile being the best and the 10th being the worst. (van der Ziel Aff. ¶ 5.) In Plaintiff's 2007 cross-evaluation, she was in the 10th decile for all of Global Equities. (Britt 2007 Cross Evaluation, Ex. H.) Plaintiff concedes that none of the individuals who evaluated her in connection with her 2006 and 2007 cross evaluations discriminated against her. (Britt Dep. at 436-39, 471-74.) Plaintiff was ranked last out of 59 in the 2007 Mid-Year Sales Trader Ranking. (Sales Traders 2007 Mid-Year Ranking, Ex. I.) In 2007, Plaintiff received a performance rating of 3. (Britt 2007 Performance Review, Ex. J.) Breheney highlighted the following deficiencies in Plaintiff's performance review: the need to be more inclusive with her colleagues with regard to her client relationships (Ex. J at ML 00139), her low scores in people leadership (Ex. J at ML 00140), her continued violation of the firm's vacation policy (Ex. J at ML 00140-41), the need to better integrate her trading peers (*id.*), her continued low scores on trader rankings and cross evaluations (*id.*), and her ineffectiveness with teammates at Merrill. (*Id.*).

Again, Warble, who Plaintiff definitively states *did not discriminate against her*, in consultation with and approval of Michael Stewart, determined Plaintiff's bonus amount for 2007. (Warble Aff. ¶ 3; Britt Dep. at 469.) In 2007, Plaintiff again received poor cross evaluation scores, ranked at the bottom of the trader ranking, and exhibited many of the same performance deficiencies as she had in 2006. Based on these factors, which were particularly unacceptable for someone at her senior title and with her level of experience, Warble recommended that Plaintiff's 2007 discretionary bonus be decreased from $775,000 in 2006 to $375,000 in 2007 (her total compensation award declined from $950,000 in 2006 to $550,000 in 2007). (Warble Aff ¶ 6.)

7

**Plaintiff's "Comparators"**

Plaintiff alleges that she was underpaid in 2006 and 2007 compared to three "similarly situated" sales traders: Michael Breheney, David Glynn, and Richard Joyce. (Britt Dep. at 564-65, 584-85, Complaint ¶ 23.)

One of Britt's alleged comparators – Michael Breheney – was hired in May 2006 and was assigned the role of pod leader, a managerial position within Sales Trading. (Breheney Dep. at 6-7, 10-11.) Indeed, he was Plaintiff's direct supervisor from October 2006 until the end of her employment with Merrill. (Britt Dep. at 136, 664-65; Breheney Dep. at 10-11, 13-14.) As an incentive to join the Firm, and due to the fact that he would forgo receiving a bonus from his previous employer, Merrill offered Breheney a guaranteed bonus for 2006 (as it did with Plaintiff in 2004 and 2005). (Breheney Dep. at 9.) As a pod leader, Plaintiff's manager, and a recent hire from Merrill's competition, Breheney's position is hardly comparable to Britt's in 2006 and 2007.

As for Joyce and Glynn, in 2006, Merrill paid the following total compensation to Plaintiff, Joyce and Glynn: Plaintiff - $950,000 (bonus of $775,000); Glynn - $900,000 (bonus of $750,000); and Joyce - $950,000 (bonus of $750,000). In 2007, they received the following total compensation: Plaintiff - $550,000 (bonus of $375,000); Glynn - $900,000 (bonus of $750,000); and Joyce - $875,000 (bonus of $675,000). (Britt, Glynn, Joyce Compensation Spreadsheets, Ex. K.)

Plaintiff concedes that she does not have knowledge as to her comparators' experience in the industry or their performance reviews. (Britt Dep. at 585-87.) Plaintiff began working as an equity sales trader in 1993. (Britt Dep. at 29.) Glynn and Joyce began as sales traders years before Britt: Glynn began in 1985 and Joyce in 1984. (Britt Dep. at 29; Deposition of David Glynn, taken November 23, 2009 ("Glynn Dep.") at 8-9, McDonald Aff.; Joyce Decl. ¶ 1.) Unlike Britt, who was a Director at Merrill (Britt Dep. at 86-87), Joyce was a Managing

8

Director – a senior officer of the firm – during the period of Plaintiff's employment with the Firm. (Joyce Decl. ¶ 3; Stewart Dep. at 12-13, McDonald Aff.)

Glynn and Joyce received performance reviews and evaluations that were superior to those of Plaintiff. On a scale of 1 to 5, with 5 being the best, in 2006 Glynn received a performance rating of 5, and Joyce received a 4, while Plaintiff received a 2. (Glynn and Joyce 2006 Performance Reviews, Exs. L and P.) In 2007, Glynn and Joyce each received a 4, while Plaintiff received a 3.[7] (Glynn and Joyce 2007 Performance Reviews, Exs. N and R.)

With respect to their 2006 cross-evaluations, Glynn was in the top 73rd percentile for all of Global Equities and Joyce was in the 45th percentile while Plaintiff was in the bottom 4th. (Glynn and Joyce 2006 Cross Evaluations, Exs. M and Q.) In 2007, when Merrill's cross-evaluations used a "decile" scale, (with the first decile as the best and the tenth decile the worst) Glynn was in the 3rd decile for all of Global Equities, and Joyce was in the 5th decile, while Plaintiff was in the bottom 10th. (Glynn and Joyce 2007 Cross Evaluations, Exs. O and S; van der Ziel Aff. ¶ 5)

As for their rankings in the Sales Traders Ranking, Glynn and Joyce were tied for 5th out of 62 (with 62nd being the lowest ranked trader) in the 2006 Sales Traders Ranking and Glynn was ranked 3rd out of 59 and Joyce was ranked 11th in the 2007 Mid-Year Sales Traders Ranking. In each of those years, Plaintiff was ranked *last*. (Exs. F and I.)

**Assignment of Accounts to Plaintiff**

While Merrill had an established relationship with its client, Wellington Management, years before Plaintiff commenced her employment with the Firm (Stewart Dep. at 49), Plaintiff was recruited by Merrill to increase visibility and production with Wellington. (Britt

---

[7] Michael Breheney, who is not alleged to have discriminated against Plaintiff, evaluated each of the three traders in 2006, and evaluated Britt and Glynn in 2007. (Exs. G, L, P, H and N.) Joyce's 2007 evaluation was completed by Jonah Cave, who also was not alleged to have discriminated against Plaintiff. (Ex. R; Britt Dep. at 569.)

KL3 2767119.12

Dep. At 37.)  When Plaintiff commenced her employment with the Firm, she worked on two accounts: Wellington and TIAA/CREF.  (Britt Dep. at 48-49.)  Ferrarie, who Plaintiff states did not discriminate against her (Britt Dep. at 360), did not assign Plaintiff to cover any additional accounts.  (Britt Dep. at 359-61.)  In 2007, Warble assigned Plaintiff to cover two additional accounts: Columbus Circle and JP Morgan.  (Britt Dep. at 50-51; 62, 66.)  Warble was responsible for determining account coverage during the time he was head of the Desk.  (Warble Aff. ¶ 8.)

Warble actually had chosen Plaintiff to cover the JP Morgan account immediately after Stuart Sharoff (who had been covering JP Morgan) left Merrill in May 2007, only to have the client reject Plaintiff's coverage.  (Warble Aff. ¶ 9; Britt Dep. at 465-68.)  Plaintiff in fact conceded that the client (JP Morgan) did not want her to cover it right away because it wanted to make Merrill lose business in an effort to make Merrill "suffer" for its previous coverage decision in 2006.  (Britt Dep. at 465-66.)  After just three months, in August 2007, Warble convinced JP Morgan to allow Britt to cover the account and he assigned the JP Morgan account to Plaintiff at that time.  (Britt Dep. at 465-68; Warble Aff. ¶ 9.)

**Plaintiff's Meetings With Human Resources and Michael Stewart in Early 2008**

Plaintiff claims that her co-worker, Richard Joyce, made sexual comments and jokes over the course of her employment with the Firm.[8]  However, Plaintiff testified that when

---

[8] Plaintiff sat next to Joyce from the fall of 2005 to the summer of 2006.  (Britt Dep. at 285-86, 656.)  She alleges that during this time he made the following discrete statements that she found offensive: said that his daughter was having her "beaver shaved," stated that their co-worker was bow-legged because her husband was black, discussed a co-worker's use of sex toys, described his sex life with his wife, and asked Plaintiff whether she had "dandruff on her fur."  (Britt Dep. at 285-87, 289-91, 295-98.)  She also claims that at least ten times he wondered aloud whether certain women wore panties or briefs.  (Britt Dep. at 292-93.)  Plaintiff testified that either no one else was present or she did not recall if anyone was present when these comments were allegedly made.  (Britt Dep. at 286-90, 293-95, 297, 300.)  Plaintiff also claims that, over the course of almost four years, Joyce made the following sexual jokes or innuendos in her presence, but not directed at her: Joyce joked about the stock symbol DKS, and would say "I have dicks for sale" (Britt Dep. at 302-03), he used the term "crack spreads," a common term to describe hedging oil futures.  (Britt Dep. at 302-03).  Lastly, in 2007 Plaintiff claims that Joyce "occasionally" asked

she and Joyce first sat together Joyce displayed no overt hostility toward her, but their relationship changed in either the summer or fall of 2006, and by 2007 they no longer spoke to one another. (Britt Dep. at 428-29, 718.) Plaintiff admits that she did not complain to Merrill about Joyce's comments until she spoke with van der Ziel in early January 2008.[9] (Britt Dep. at 286-87, 289-90, 294, 297, 302.) The purpose of their meeting was to discuss Plaintiff's negative performance review. (Britt Dep. at 480-81, 484; van der Ziel Dep. at 31.) (See discussion of Plaintiff's 2007 performance review, Ex. J, *supra* at p. 7.) Plaintiff imparted to van der Ziel that she was "disillusioned by not being liked on the desk" and expressed "concern[s] about the content of the review from her manager." (van der Ziel Dep. at 33.) Van der Ziel and Britt discussed "how to raise her profile because her scores were extremely low." (van der Ziel Dep. at 34.) Indeed, van der Ziel suggested that Merrill assign a coach to Britt to help her change "how people viewed her on the desk." (*Id.*) Britt claims that she told van der Ziel about some of Joyce's conduct.[10]

After the meeting, van der Ziel met with Michael Stewart to discuss Plaintiff's reports of issues on the sales trading desk. (Stewart Dep. at 76, 79-80; van der Ziel Dep. at 52.) They decided that Stewart would meet with Plaintiff to solicit more information regarding her

---

colleagues if they were "giving your wife any wood tonight." (Britt Dep. at 301.) Plaintiff testified that when she and Joyce first sat together Joyce displayed no overt hostility toward her, but their relationship changed in either the summer or fall of 2006, and by 2007 they no longer spoke to one another. (Britt Dep. at 428-29, 718.)

[9] While Britt alleges that she suggested to Silvia Rocco in or about 2006 that Rocco speak to Joyce about "comments" he allegedly made (Britt Dep. at 278-80), she conceded that she did not recall whether Rocco was her pod leader at the time (*id.* at 280), she did not tell Rocco about any specific comments (rather, her statement about Joyce's "comments" was general) (*id.*), she suggested this to Rocco "because there [were] four or three women around [Joyce]" (*id.* at 279), she did not ask Rocco to do anything with the information, other than to speak with Joyce (*id.* at 280), Rocco in fact spoke to Joyce (*id.* at 279) and Britt thought Rocco handled her request well (*id.* at 280).

[10] The only statements Britt claims she told van der Ziel in early January were that Joyce: told her to "shut the fuck up," said that his daughter was having her "beaver shaved," asked Plaintiff whether she had "dandruff on her fur," and asked a colleague if he was "giving your wife any wood tonight." (Britt. Dep. at 311-12, 485-86, 516-17.)

allegations. (Stewart Dep. at 90; van der Ziel Dep. at 62-63.)  Stewart and Plaintiff met shortly

after January 11, 2008 (Britt Dep. at 506-07) for at least one hour and the conversation focused

primarily on her bonus, which she had been informed of on January 10, 2008 (van der Ziel Dep. at

47-48), and her belief that people did not like her.  (Britt Dep. at 511-12; Stewart Dep. at 84-87.)

When she made a passing reference to "comments on the desk," Stewart asked her for details and

made clear that he was not aware of any inappropriate comments and would not tolerate such

behavior. (Stewart Dep. at 85-86.)  Plaintiff did not give him any specific examples.  (Britt Dep.

at 517.)  She stated that she had a file containing the comments, but she did not want to give it to

Stewart. (Stewart Dep. at 86.)  He asked her to give the file to Human Resources and emphasized

that he needed to know if there was anything inappropriate going on, asking her specifically to

follow-up with him.  (Stewart Dep. at 83, 86-87.)  At the end of the conversation, he asked her

whether they would have met if she had received a higher bonus – she said no.  (Stewart Dep. at

86.)

        Plaintiff *never* complained that her compensation was decreased due to her gender.

(Britt Dep. 503-04, 514.)  Stewart was adamant that he did not want Britt to leave the Firm.  (van

der Ziel Dep. at 55-56; Britt Dep. at 529-30, 533-34.)  Accordingly, van der Ziel considered it her

goal to "help [Plaintiff] raise her profile and help get her performance back."  (van der Ziel Dep. at

56.)  Plaintiff testified that van der Ziel did not discriminate against her.  (Britt Dep. at 534.)

        Plaintiff alleges that in retaliation for her "protected activity" Merrill decreased her

2007 bonus.  (Britt Dep. at 580-82.)  Plaintiff's meeting with van der Ziel occurred on or about

January 7, 2008 and she learned of her bonus on January 10, 2008 (van der Ziel Dep. at 32, 47-

48.)  Bonus amounts for Merrill employees, including Plaintiff, were determined by early

December 2007 and awarded in January 2008.  (van der Ziel Dep. at 51-52; Warble Aff. ¶ 7.)

Plaintiff admits that she did not know if her bonus amount changed between her conversation with

van der Ziel and receiving notice of her bonus amount.  (Britt. Dep. at 581-82.)  Warble

12

recommended Britt's bonus amount of $375,000 before it came to his attention in early 2008 that

Britt brought certain concerns to Human Resources. (Warble Aff. ¶ 7.)

Plaintiff alleges that after she reported his conduct, Joyce, who was never

Plaintiff's supervisor, engaged in retaliatory conduct. [11]  However, Joyce had absolutely no

knowledge of Plaintiff's complaint to Merrill until the commencement of this litigation.

(Joyce Decl. ¶ 5.)

**Plaintiff's Resignation**

Plaintiff met with van der Ziel in late January 2008 and told her she was planning

to leave the Firm. (Britt Dep. at 522-25.) Plaintiff's last day at Merrill was February 28, 2008.

(Britt Dep. at 544.) Plaintiff admits that no specific events occurred immediately prior to her

departure. (*Id.*)

**Argument**

**I.**

**SUMMARY JUDGMENT IS AN APPROPRIATE PROCEDURE**
**FOR RESOLVING EMPLOYMENT DISCRIMINATION CLAIMS**

Rule 56(c) mandates the entry of summary judgment against a non-moving party

who fails to sufficiently establish the existence of each "essential element" of that party's case and

on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S.

317, 322-24 (1986). The Second Circuit has consistently approved and reaffirmed the use of

summary judgment in employment discrimination cases:

> Summary judgment is appropriate even in discrimination cases, for,
> as this Court noted, the salutary purposes of summary judgment –
> avoiding protracted, expensive and harassing trials – apply no less to
> discrimination cases than to . . . other areas of litigation. Just a few
> short years ago we went out of our way to remind district courts that

---

[11] Plaintiff alleges that Joyce told her to "shut the fuck up" six times, called her a "cunt" twice,
rolled his eyes at her when she said something incorrectly, criticized her, and tapped his watch.
(Britt Dep. at 535-37). These are the only times that Joyce allegedly called her a "cunt." (Britt
Dep. at 688-89.)

the impression that summary judgment is unavailable to defendants
in discrimination cases is unsupportable.

*Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (internal citations and quotation

marks omitted); *see also Watson v. Arts & Entm't TV Network*, 04 Civ 1932 (HBP), 2008 U.S.

Dist. LEXIS 24059, at *13-14 (S.D.N.Y. Mar. 26, 2008), *aff'd*, 352 Fed. Appx. 475 (2d Cir.

2009).

　　　　Second Circuit courts routinely grant summary judgment in cases brought under the

New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law

("NYCHRL"), where, as here, there is insufficient evidence to support a plaintiff's claims of

employment discrimination.  *See, e.g., Panzarino v. Deloitte & Touche LLP*, 05 Civ. 8502

(BSJ)(RLE), 2009 U.S. Dist. LEXIS 101209, at *29-30 (S.D.N.Y. Oct. 29, 2009) (gender

discrimination claim); *Sicular v. N.Y.C. Dep't of Homeless Servs.*, 09 Civ. 0981 (AKH)(AJP),

2010 U.S. Dist. LEXIS 10089, at *100-101 (S.D.N.Y. Feb. 4, 2010) (age, race, religion claims);

*Bernard v. J.P. Morgan Chase Bank N.A.*, 08 Civ. 4784 (THK), 2010 U.S. Dist. LEXIS 10195, at

*50 (S.D.N.Y. Feb. 5, 2010) (gender and race claims).

　　　　Because for the sake of this motion we accept as true Plaintiff's evidence, the

material facts in this case are not in dispute.  Even with the benefit of that presumption, Plaintiff

falls short of her burden of demonstrating evidence sufficient to support necessary elements of her

claims.

## II.

### PLAINTIFF'S CLAIMS ALLEGING GENDER DISCRIMINATION WITH REGARD TO HER COMPENSATION SHOULD BE DISMISSED

　　　　While Plaintiff does not raise Title VII claims, courts use the same framework to

analyze Title VII claims as they do for claims brought under the NYSHRL and NYCHRL.  *See*

*Weinstock*, 224 F.3d at 42 n.1; *Kaur v. N.Y. City Health & Hosp. Corp.*, 688 F. Supp. 2d 317, 339

(S.D.N.Y. 2010).  Consequently, Plaintiff's claims must be analyzed under the three-part test

14

provided by the court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973):

> First, a plaintiff must prove by a preponderance of the evidence, a prima facie case of discrimination. The burden here is de minimus. Second, if a plaintiff makes such a showing, the burden then shifts to defendants to articulate a legitimate, non-discriminatory business rationale for the adverse action about which plaintiff is complaining. If the employer articulates such a reason, the presumption of . . . discrimination dissolves, and the burden shifts back to the plaintiff to prove that the employer's stated reasons are merely pretextual and that . . . discrimination was the true reason for the adverse employment action.

*Weiss v. Morgan Stanley Inv. Mgmt.*, 05 CV 3310 (GBD), 2008 U.S. Dist. LEXIS 24400, at *12

(S.D.N.Y. Mar. 27, 2008) (internal citations omitted), *aff'd*, 345 Fed. Appx. 713 (2d Cir. 2009).

Plaintiff's claims that her bonus compensation was reduced in 2006 and 2007 due to her gender fail under both the state and city laws for two reasons. First, she cannot establish an inference of discrimination to support her *prima facie* case. Second, she cannot show that Merrill's proffered reasons for its decisions were pretextual and that they were more likely than not motivated by her gender.

**A.     Plaintiff Fails to Establish a *Prima Facie* Case of Disparate Pay**

Plaintiff must show the following to establish a *prima facie* case of gender discrimination: "(1) she is a member of the protected class; (2) she is qualified for her position; (3) she has suffered an adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of discrimination." *Weiss*, 2008 U.S. Dist. LEXIS 24400, at *12.

*See also Fosen v. N.Y. Times*, 03 CV 3785 (KMK) (THK), 2006 U.S. Dist. LEXIS 75662, at *11 (S.D.N.Y. Oct. 11, 2006). Plaintiff provides no evidence to support her claims that her bonus compensation was determined within circumstances giving rise to an inference of discrimination.

**1.     Britt Is Not Similarly Situated To Her Alleged Comparators**

Where a discrimination claim is based on disparate pay, the prima facie case must include proof that the plaintiff was paid "less than similarly situated non-members of the class." *Shah v. Wilco Sys., Inc.*, 27 A.D.3d 169, 176 (1st Dep't 2005). Further, a plaintiff must produce

15

evidence that the employer acted with discriminatory animus. *Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir.1999). Plaintiff cannot satisfy either of these requirements.

"[W]here a plaintiff seeks to make out her prima facie case by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that she shared sufficient employment characteristics with that comparator so that they could be considered similarly situated." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)). While the plaintiff need not show that she was similar to the comparators in all respects she does bear the burden of showing that they were "similarly situated in all material respects." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (citation omitted).

Plaintiff alleges that she was similarly situated to Michael Breheney, David Glynn, and Richard Joyce. (Britt Dep. at 564-65, 583-84.) As an initial matter, Plaintiff's prima facie case of disparate pay fails because in 2006 two of the three alleged comparators, Glynn and Joyce, received lower bonuses than Plaintiff. (Ex. K.) The third alleged comparator, Michael Breheney, is not similarly situated for two reasons. First, he was new to Merrill, having been hired in May 2006. (Breheney Dep. at 6-7.) As an incentive to join the Firm, and due to the fact that he would forgo receiving a bonus from his previous employer, Merrill offered him a guaranteed bonus for 2006 (as it did with Plaintiff in 2004 and 2005). (Breheney Dep. at 9.) Additionally, Breheney was Plaintiff's pod leader, a managerial position within Sales Trading. (Breheney Dep. at 10-11.) He supervised Plaintiff and as a result is certainly not similarly situated. (Britt Dep. at 135-36, 665-66.) *See Sealy v. Hertz Corp.*, 688 F. Supp. 2d 247, 256 (S.D.N.Y. 2009) (holding that a supervisor was not similarly situated to his supervisee); *Mark v. Mount Sinai Hosp.*, 85 F. Supp. 2d 252, 259 (S.D.N.Y. 2000) (granting defendant summary judgment on NYCHRL and NYSHRL claims and stating that a staff member is not similarly situated to an employee with supervisory responsibilities).

16

While the other two alleged comparators – Joyce and Glynn – received higher bonuses than Plaintiff in 2007, they also are not similarly situated to her. To assess whether comparators are similarly situated courts evaluate the individuals' seniority, breadth of experience and performance. *See, e.g., Fahmy v. Duane Reade, Inc.*, 04 CIV. 1798 (DLC), 2006 U.S. Dist. LEXIS 37703, at *29 (S.D.N.Y. June 9, 2006) (rejecting assertion that plaintiff was similarly situated to other employees in terms of previous experience); *Chan v. NYU Downtown Hosp.*, 03 Civ. 3003 (RMB), 2005 U.S. Dist. LEXIS 40243, at *11 (S.D.N.Y. Feb. 14, 2005) (finding that plaintiff failed to raise a material issue that her comparators were similarly situated where she did not "account[ ] for differences in education, seniority, performance, or specific work duties."). Plaintiff conceded that she does not have knowledge as to her comparators experience in the industry or their performance reviews. (Britt Dep. at 586-87.) As shown below, Glynn and Joyce were far more experienced and successful sales traders than Plaintiff:

|  | Plaintiff | Glynn | Joyce |
|---|---|---|---|
| Began working as equity trader | 1993 (Britt Dep. at 29.) | 1985 (Glynn Dep. at 8-9.) | 1984 (Joyce Decl. ¶ 1.) |
| 2006 Sales Traders Ranking | Last out of 62 (Ex F.) | 5th out of 62 (Ex. F.) | 5th out of 62 (Ex. F.) |
| 2007 Sales Traders Mid-Year Ranking | Last out of 59 (Ex. I.) | 3rd out of 59 (Ex. I.) | 11th out of 59 (Ex. I.) |
| 2006 Performance Evaluation | 2 (out of 5) (Ex. G.) | 5 (out of 5) (Ex. L.) | 4 (out of 5) (Ex. P.) |
| 2007 Performance Evaluation | 3 (out of 5) (Ex. J.) | 4 (out of 5) (Ex. N.) | 4 (out of 5) (Ex. R.) |
| 2006 Cross Evaluations | Bottom 4th percentile (Ex. E.) | 73rd percentile (Ex. M.) | 45th percentile (Ex. Q.) |
| 2007 Cross Evaluation | Bottom 10th decile (Ex. H.) | 3rd decile (Ex. O.) | 5th decile (Ex. S.) |

Given Glynn's and Joyce's contributions to the Firm, as evidenced by their work experience, seniority and evaluations, no reasonable jury could find that either individual is similarly situated in all material respects to Plaintiff. *See Bandham v. Lab. Corp. of Am.*,

17

KL3 2767119.12

234 F. Supp. 2d 313, 317-18 (S.D.N.Y. 2002) (plaintiff failed to establish prima facie case of

discrimination where her comparator had six more years of experience, and had been employed by

defendant at least three years longer than Plaintiff); *McDowell v. T-Mobile USA, Inc.*, 04 CV 2909

(DGT), 2007 U.S. Dist. LEXIS 71591, at *28 (E.D.N.Y. Sept. 26, 2007) (noting plaintiff's failure

to provide evidence that his "comparators" received negative performance reviews comparable to

plaintiff's review), *aff'd*, 307 Fed. Appx. 531 (2d Cir. 2009); *Chinnici v. Fraas USA, Inc.*, Index.

No. 109155/08, 2010 NY Misc. LEXIS 2053, at *16-17 (Sup. Ct. N.Y. Cnty. May 10, 2010)

(rejecting plaintiff's argument that he and his co-worker were similarly situated where their

"performance levels differed greatly"). *See also Fahmy*, 2006 U.S. Dist. LEXIS 37703, at *29;

*Chan v. NYU Downtown Hospital*, 2005 U.S. Dist. LEXIS 40243 at *11.

### 2.    The Alleged Denial of Accounts Does Not Raise an Inference of Discrimination

Next, Plaintiff claims that she believes her compensation was reduced because she

was denied coverage of two accounts that were reassigned after her colleague, Stuart Sharoff, left

the firm: (1) JP Morgan, and (2) Merrill Lynch Investment Management. (Complaint ¶¶ 22, 40,

71; Britt Dep. at 461-65, 572-73.) She alleges the following in support of her belief: (1) her

supervisor, Michael Breheney, said that Glynn would cover one of the accounts because he is a

"better athlete;" (2) a co-worker, Richard Joyce, said that Merrill wanted a "young guy that gets

in early and knows the research . . . the future of the firm;" and (3) Henry Mulholland made

statements that she did not "belong" at Merrill, shunned her, and criticized her performance. (Britt

Dep. at 304, 388, 464-65, 550-52, 572-73, 649-652.) None of these allegations raise an inference

of gender discrimination in the payment of Plaintiff's 2006 and 2007 bonuses.

As an initial matter, Brennan Warble, who Plaintiff definitively states did *not*

discriminate against her, decided Plaintiff's account coverage. (Britt Dep. at 466-67.) In any

event, Warble actually assigned one of the two client accounts about which Plaintiff complains –
JP Morgan – to Plaintiff.

Indeed, Warble actually chose Plaintiff to cover the JP Morgan account
immediately after Sharoff left Merrill in May 2007, only to have the *client* reject Plaintiff's
coverage, a fact conceded by Plaintiff. (Warble Aff. ¶ 9; Britt Dep. at 465-69.) (Britt Dep. at 465-
66.)  As mentioned above, no discrimination may be inferred because, after just three months, in
August 2007, Warble was able to convince the client that Britt should cover the account and Britt
was in fact assigned the JP Morgan account. (Britt Dep. at 62, 465-68; Warble Aff. ¶ 9.) *See*
*Brady v. Calyon Sec. (USA)*, 05 Civ. 3470 (GEL), 2007 U.S. Dist. LEXIS 92602, at *48-49
(S.D.N.Y. Dec. 17, 2007) (granting summary judgment where plaintiff claimed that his
compensation was discriminatory, but received an increase after the alleged discriminatory act).

Moreover, Warble assigned at lease one additional account to Plaintiff– Columbus
Circle. (Britt Dep. at 66.)  Thus, any claim that Warble's assignment of accounts was tainted by
Plaintiff's gender is meritless.

Plaintiff believes that Breheney's alleged statement that Glynn would cover the
Merrill Lynch Investment Management account instead of her because Glynn is "a better athlete"
shows discrimination. However, she has stated definitely that Breheney did not discriminate
against her. (Britt Dep. at 349.)  In any event, her belief is based on her subjective notion that men
are better athletes; indeed, she conceded that the term "athlete" does not refer only to men. (Britt
Dep. at 573.)

Next, Plaintiff provides mere conjecture to support her allegation that Joyce's
statement about a "guy" being chosen to cover an account was evidence of discriminatory animus.
Joyce's use of the term "guy" is not indicative of discriminatory intent, and in any event, Joyce
had no input into the coverage of accounts. (Warble Aff. ¶ 10.) *See Opoku-Acheampong v.*
*Depository Trust Co.*, 99 Civ. 0774 (GBD), 2005 U.S. Dist. LEXIS 16387, at *10-11 (S.D.N.Y.

19

Aug. 9, 2005) (dismissing claims based on stray comments by co-workers who had no decision-making authority).

Finally, the statements attributed to Mulholland are not gender-based and therefore do not support an inference of discrimination.  Moreover, it is undisputed that Warble – whom Plaintiff conceded did not discriminate against her – recommended her 2006 and 2007 bonuses.

**B.    Merrill Had Legitimate Reasons for Plaintiff's 2006 and 2007 Bonus Amounts and Plaintiff Cannot Show That Merrill's Reasons Are Pretextual**

Notwithstanding the fact that Plaintiff cannot establish her *prima facie* case, Merrill provides legitimate reasons for Plaintiff's 2006 and 2007 bonus amounts.  Plaintiff's agreement with Merrill provided that she would receive total compensation of $1.5 million for 2004 and $1.2 million for 2005.  (Britt Dep. at 89-90.)  After 2005, her bonus amounts were discretionary.  (Ex. D at P106 and P111, ¶ 5; Britt. Dep. at 673.)   Merrill's 2006 and 2007 discretionary bonus payments to Plaintiff were based on the poor evaluations she received and her performance deficiencies.

Brennan Warble, the Head of Equity Sales Trading for the Americas at that time, in consultation with and approval of Michael Stewart, determined Plaintiff's 2006 and 2007 bonus amounts.  (Warble Aff. ¶ 3.)  Because *Plaintiff definitively states that Warble did not discriminate against her* (Britt Dep. at 469), his reasons for recommending Plaintiff's 2006 and 2007 bonus amounts are, by definition, legitimate and not related to her gender.

In any event, Warble properly exercised his discretion in recommending Plaintiff's bonuses in 2006 and 2007, based on Plaintiff's performance.  In determining bonus compensation for sales traders, Merrill takes many factors into account including performance reviews, cross-evaluations, and sales traders rankings.  (Stewart Dep. at 27-28).  As discussed above at pages 5-7, Plaintiff was ranked last in the trader rankings for 2006 and 2007 and her ratings in cross-evaluations and performance reviews were also abysmally low.  Importantly, Plaintiff concedes

20

that none of the individuals who evaluated her in connection with her 2006 and 2007 cross

evaluations discriminated against her. (Britt Dep. at 436-39, 471-74.)  Her performance reviews

throughout her employment at Merrill reference her need to improve relationships with her

colleagues. (Exs. G and J.)  In 2006, Breheney noted several additional areas in which Plaintiff's

performance required improvement, including, without limitation, her increased use of the Firm's

capital (Ex. G at ML 00136-37), her understanding and use of the business tools made available

by the Firm (*id.* at ML 00138), her attendance in the workplace (noting 41 vacation days) (*id.* at

ML 00137),[12] and her ranking at the bottom of all sales traders on the 2006 Sales Traders Ranking.

(*Id.*)  And in 2007, Breheney indicated that Plaintiff should be more inclusive with her colleagues

concerning her client relationships (Ex. J at ML 00139), continued to violate the Firm's vacation

policy (*id.* at ML 00140-41), and again received poor scores on sales trader ranking and cross

evaluations.  (*Id.*)  Again, Plaintiff definitively stated that Breheney did not discriminate against

her based on her gender. (Britt Dep. at 349.)

      Merrill's policy and the offer letter Plaintiff signed when she was hired allowed

Warble to use his discretion in recommending Plaintiff's bonuses. (Ex. D at P106 and P111, ¶ 5.)

His decision to make the recommendations as to Plaintiff's bonuses with respect to years 2006 and

2007 under a discretionary bonus policy is "justified by the business reasons provided." *See*

*Ferrand v. Credit Lyonnais*, 02 Civ. 5191 (VM), 2003 U.S. Dist. LEXIS 17202, at *19 (S.D.N.Y.

Sept. 30, 2003) (finding the legitimate business reason of awarding higher bonuses to employees

showing good performance is reasonable), *aff'd*, 110 Fed. Appx. 160 (2d Cir. 2004).

      Additionally, Plaintiff cannot show that Merrill's legitimate reasons for Plaintiff's

2006 and 2007 bonuses are pretextual.  The most that Plaintiff can argue is that she disagrees with

---

[12] Merrill's vacation policy, available to employees on Merrill's "intranet" provided that,
employees with the title Director had four weeks (or 20 days) of vacation if they had less than 25
years of service.  (van der Ziel Dep. at 37-38; Ex. T.)

the assessment of her performance, and thus with the decisions as to her compensation in 2006 and 2007. Indeed, Plaintiff has testified that she believes her 2006 compensation of $950,000 (comprised of a discretionary bonus) was low "relative to what [she] was paid in 2005" (which included a guaranteed bonus). (Britt Dep. at 460.) But, a court "does not sit as a super-personnel department," reexamining Merrill's business decisions. *Weiss*, 2008 U.S. Dist. LEXIS 24400, at *17 (noting that "[a]lthough plaintiff disagrees with defendant's characterization of her work performance, this Court will not 'delve into the question of which portrayal is the correct one...'"). She may not merely allege discrimination, she "must provide the Court with evidence of such discrimination." *Weiss*, 2008 U.S. Dist. LEXIS 24400, at *13, 17 (finding that plaintiff provided no evidence that plaintiff's gender was the reason for her compensation). Because Plaintiff cannot provide the court with evidence "that reasonably supports a finding of prohibited discrimination" with regard to her 2006 and 2007 compensation, Merrill is entitled to summary judgment. *Bernard*, 2010 U.S. Dist. LEXIS 10195, at *18, 29 (explaining plaintiff must show evidence sufficient to "support a rational finding" that the defendant's employment decision was "more likely than not based in whole or in part on discrimination") (citations omitted).

**C.     Plaintiff's Claims Cannot Survive Summary Judgment under the NYCHRL**

While the 2005 Restoration Act amended the NYCHRL, "[n]one of the . . . amendments to the NYCHRL altered the standard by which a court should determine whether a discriminatory act has occurred . . . ." *Wilson v. N.Y.P. Holdings, Inc.*, No. 05 Civ. 10355, 2009 U.S. Dist. LEXIS 28876, at *87 (S.D.N.Y. Mar. 31, 2009). *See also Bernard*, 2010 U.S. Dist. LEXIS 10195, at *26 (holding that NYCHRL claims are analyzed under the same framework as Title VII claims). Plaintiff's conclusory statements regarding alleged inferences of discrimination and pretext "cannot give rise to an inference of discrimination, even under the more expansive protections of the HR Code." *Sealy*, 688 F. Supp. 2d at 258-59. As shown above, she has offered *no evidence*, much less the preponderance of evidence necessary, to show that she was "treated

22

less well than other employees because of her gender" as required under the NYCHRL. *Bernard*, 2010 U.S. Dist. LEXIS 10195, at *26-27 (granting defendant summary judgment on plaintiff's NYCHRL disparate treatment claim). As a result, Plaintiff's claims of disparate treatment under the NYCHRL do not survive summary judgment.

III.

## PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIMS BASED ON HER GENDER FAIL

Plaintiff's claims of hostile work environment cannot survive summary judgment under either the NYSHRL or the NYCHRL. To prevail on her NYSHRL hostile work environment claim, Plaintiff must show: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of her employment creating an abusive working environment, and (2) that there is a specific basis for imputing the alleged conduct to the employer. *See Kaur*, 688 F. Supp. 2d at 336-37 (internal citations and quotations marks omitted).

Under the NYCHRL, employers are not liable for alleged gender-based hostile work environment if the alleged conduct consists of "nothing more than what a reasonable victim of discrimination would consider 'petty slights or trivial inconveniences.'" *Williams v. N.Y. City Housing Auth.*, 61 A.D.3d 62, 80 (1st Dep't 2009). *See also Kaur*, 688 F. Supp. 2d at 340 (stating same). An employer is liable for a co-worker's discriminatory conduct if it knew or should have known of the conduct and failed to act reasonably. *See* N.Y.C. Admin. Code § 8-107 (13b).

A.    **Plaintiff Cannot Impute Joyce's Alleged Conduct to Merrill**

Plaintiff cannot show that any of Joyce's alleged conduct could be imputed to Merrill. Because Joyce is her co-worker, she must establish that Merrill "failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate action." *Kaur*, 688 F. Supp. 2d at 337 (citation omitted). *See also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998) ("the employer will generally not be liable unless the employer either provided no reasonable

23

avenue of complaint or knew of the harassment but did nothing about it") (citation omitted);

N.Y.C. Admin. Code § 8-107 (13b).

   Plaintiff does not allege that there was no avenue for complaint;[13] therefore, she

must show that Merrill knew or should have known about the "harassment" and failed to take

appropriate action. Yet, Plaintiff did not complain to Merrill about Joyce's alleged comments

until she spoke with van der Ziel in early January 2008 – just weeks before she decided to leave

Merrill – and she only reported some of Joyce's alleged conduct in the context of discussing

Plaintiff's negative performance review. (See page 11, n.10; Britt Dep. at 480-81, 484, 523-24;

van der Ziel Dep. at 31.)

   Furthermore, any alleged improper conduct by Joyce cannot be imputed to Merrill

because Merrill made reasonable efforts to investigate Plaintiff's allegations, only to have Plaintiff

refuse to participate in the inquiry and then resign. After Plaintiff met with van der Ziel, the Firm

elected to have a senior executive at Merrill – Michael Stewart, Head of Global Cash Equities –

meet with Plaintiff to discuss her concerns and investigate her allegations. (Stewart Dep. at 90;

van der Ziel Dep. at 62-63.) As detailed above (*supra* at p. 12), shortly after January 11, 2008,

Stewart spoke with Plaintiff at length, stating that Merrill would not tolerate improper comments

on the Desk, asking for the notes Plaintiff had mentioned, and emphasizing his need to know if

there was anything inappropriate going on. Plaintiff never provided Merrill with her notes or any

additional information. By the end of January 2008, Plaintiff had decided to resign. Importantly,

Plaintiff definitively stated at the meeting with Stewart that she would not have met with him if

she had received a higher bonus, confirming that the actual source of her frustration was her

---

[13] As indicated above at p. 3, Merrill's Matter of Respect policy (Ex. B) and the two training programs in which Plaintiff participated list three different ways for employee's to raise concerns about harassing or discriminatory conduct. Plaintiff received this policy upon her employment and completed training on it.

disappointment with her bonus compensation and not any alleged hostile work environment. In light of Plaintiff's refusal to participate in the Firm's investigation of her claims – an investigation led by Stewart, who Plaintiff has testified *did not discriminate against her* (Britt Dep. at 534) – Joyce's alleged conduct may not be imputed to Merrill. *Robinson v. Metro-North Commuter R.R. Co.*, 94 Civ. 7374 (JSR), 95 Civ. 8594 (JSR), 1998 U.S. Dist. LEXIS 373, at *26-27 (S.D.N.Y. Jan. 15, 1998) (no imputation to employer where "although [plaintiff] complained of inappropriate physical contact and comments by co-workers and supervisors, she refused to cooperate with the investigation commenced by [her employer]"); *Galarza v. Am. Home Assurance Co.*, 99 F. Supp. 2d 251, 256 (E.D.N.Y. 2000) (co-workers' alleged conduct was not imputed to employer where employer made diligent efforts to enable plaintiff to avail herself of the complaint procedure as soon as it learned of her complaint).[14]

## B.   The Alleged Conduct Is Not Severe or Pervasive[15]

To show that conduct is "severe and pervasive," Plaintiff "must produce evidence

---

[14] Plaintiff's request for punitive damages under the NYCHRL is assessed within the same framework as under federal law. *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 101 (2d Cir. 2001). Here, Plaintiff is not entitled to punitive damages because Merrill "had an antidiscrimination policy and made a good faith effort to enforce it." *See Mugavero v. Arms Acres, Inc.*, 03 Civ 05724 (PGG), 2009 U.S. Dist. LEXIS 30431 at *72-74 (S.D.N.Y. Mar. 31, 2009) (granting summary judgment on plaintiff's claim for punitive damages because defendants established that they had an adequate policy in place and made a good faith effort to enforce it). Punitive damages are not available under the NYSHRL. *Farias*, 259 F.3d at 101.

[15] Plaintiff has also alleged harassment by Michael Lynch, an individual to whom she did not report. She claims that in March of 2005, Lynch said that because he was involved in her hiring and she was going to take maternity leave, he was demoted. (Britt Dep. at 142-43; Complaint ¶ 22.) The alleged harassment by Lynch, based solely on this purported comment, is time-barred because Plaintiff filed her Complaint on July 11, 2008 and the harassment allegedly occurred in March 2005 – outside of the three year statute of limitations for claims filed under the NYSHRL and the NYCHRL. *See* CPLR § 214(2); N.Y.C. Admin. Code § 8-502(d) ("[a] civil action commenced under this section must be commenced within three years after the alleged unlawful discriminatory practice or act of discriminatory harassment . . . ."). Plaintiff also claims that Henry Mulholland subjected her to harassment. (Britt Dep. at 569.) However, Mulholland's alleged statements – that she was "not part of the Merrill team" and did not "belong" at Merrill (Britt Dep. at 458, 558-59) – allegedly made in December 2004, are time-barred and are not in any event tied to Plaintiff's gender.

25

that the work place is permeated with discriminatory intimidation, ridicule, and insult, that

. . . alter[s] the conditions of the victim's employment." *Garcia v. N.Y. City Admin. for Children's*

*Servs.*, 03 Civ. 05271 (GBD), 2007 U.S. Dist. LEXIS 71273, at *17-18 (S.D.N.Y. Sept. 26, 2007)

(internal citations and quotations omitted), *aff'd*, 354 Fed. Appx. 476 (2d Cir. 2009). "Conduct

that is merely offensive, unprofessional or childish cannot support a hostile work environment

claim." *Payton v. City Univ. of New York*, 453 F. Supp.2d 775, 785 (S.D.N.Y. 2006) (internal

quotations and citations omitted). Plaintiff's allegations that her co-worker, Stuart Sharoff,

"harassed" her about her personal life and finances while they worked together at Merrill cannot

be tied to her gender and thus are not actionable. (Britt Dep. at 352-53.) *See Brown v. Henderson*,

257 F.3d 246, 255 (2d Cir. 2001) (where behavior cited by the plaintiff was unrelated to her sex,

she was unable to show a hostile work environment). Further, while Plaintiff may have been

offended by Sharoff's alleged comments, made before March 2006, that "Merrill paid you all of

this money to come and work here, and then you went out on maternity leave" (Britt Dep. at 354),

they clearly are not sufficiently severe or pervasive to constitute a hostile work environment. (*See*

cases cited *infra* at pp. 27-30.) Moreover, Plaintiff claims that she reported Sharoff's alleged

conduct to Merrill's Human Resources Department in or about March 2006, Merrill assigned

Sharoff a coach in response, and Merrill took her report of Sharoff's conduct seriously. (Britt

Dep. at 356-66.) Plaintiff could not recall any further problems with Sharoff's conduct after her

report to Human Resources. (*Id.*) Indeed, Britt testified that she accepted employment with

LaBranche Securities after she left Merrill – where Sharoff was employed – and in fact worked on

a team with Sharoff while at LaBranche. (Britt Dep. at 365-367.) Any claim of hostile work

environment based on Sharoff's alleged conduct clearly cannot succeed because such conduct

ceased after her report to Human Resources. *See Sutton v. N.Y. City Transit Auth.*, No. 02-CV-

1441 (RRM)(JO), 2009 U.S. Dist. LEXIS 118309, at *15-16 (S.D.N.Y. Sept. 30, 2009) (conduct

ceased as soon as plaintiff complained and thus employer could not be liable).

The alleged comments by Richard Joyce[16] were not so severe or pervasive that they effected a change in the terms and conditions of plaintiff's employment and thus constituted a hostile work environment. "[I]solated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1306 n.5 (2d Cir. 1995). The alleged remarks were not pervasive because they did not occur with any regularity. Over the course of four years, Plaintiff describes five sexual statements he made while sitting next to her and occasional jokes that Joyce made about himself or other individuals that Plaintiff overheard. *See, e.g., Panzarino*, 2009 U.S. Dist. LEXIS 101209, at *25-26 (granting summary judgment for defendant where plaintiff's supervisor made only eight pregnancy-related comments in approximately one year and cursed approximately once a month); *Lamar v. NYNEX Serv. Co.*, 891 F. Supp. 184, 185 (S.D.N.Y. 1995) ("[T]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.") (citation omitted); *Fosen*, 2006 U.S. Dist. LEXIS 75662, at *27 ("Generally, the episodic incident is not enough"); *Fullwood v. Ass'n for the Help of Retarded Children, Inc.*, 08 CV 6739 (DAB), 2010 U.S. Dist. LEXIS 107713 at *24-25, (S.D.N.Y. Sept. 28, 2010) (racial jokes made four times over a two-year period "may be inappropriate and offensive, but no rational fact finder could conclude that the harassment was so severe or pervasive as to alter the conditions of Plaintiff's employment.").

Nor were the alleged comments and jokes sufficiently severe to constitute a hostile work environment. Over the course of four years, according to Plaintiff Joyce made only one comment – actually a question – concerning her body: whether she had "dandruff on her fur." Joyce's alleged conduct is not sufficiently severe to constitute sexual harassment. *See Quinn*, 159

---

[16] The alleged comments are set forth in footnotes 8 and 11.

F.3d at 768 (plaintiff voted "sleekest ass" and supervisor's touching of her breasts with papers not "severe" conduct); *DeSimone v. JP Morgan/Chase Bank*, 02 Civ. 7039 (RPP), 2004 U.S. Dist. LEXIS 25621 at *19-22 (S.D.N.Y. Dec. 21, 2004) (dismissing hostile work environment claim based on her supervisor's frequent use of the word "fuck" when speaking with her, asking her out for drinks and dinner repeatedly despite being rejected, leering and staring at her body, stating that a female co-worker kept her job only because she was dating a senior-level employee, stating that a female co-worker "had to fucking sleep her way to the top," referring to another female co-worker as the "curvy one," and suggesting that a female co-worker "needed sex" and telling the plaintiff "he wanted to swap his wife with another senior-level employee's young girlfriend"); *Ricard v. Kraft Gen. Foods*, No. 92 Civ. 2256, 1993 WL 385129, at *3 (S.D.N.Y. 1993) (supervisor's acts of putting his arms around and hugging and kissing plaintiff, and asking plaintiff about her sex life were insufficient "to establish the existence of the poisoned atmosphere necessary [sic] for an actionable hostile environment claim"), *aff'd*, 17 F.3d 1426 (2d Cir. 1994); *Lamar*, 891 F. Supp. at 185 (touching of plaintiff's hand, staring at the plaintiff, and statement that plaintiff looked "hot" were "too mild and infrequent to constitute sexual harassment as a matter of law).

      Plaintiff's allegation that Joyce called her a "cunt" on two occasions is insufficient to rise to the necessary severity required to create a hostile work environment. *See Kaur*, 688 F. Supp. 2d at 338 (holding that two racist statements were deplorable, but did not alter the plaintiff's employment conditions.) Although Joyce was not a supervisor, even if he were, his occasional use of "sexist language," does not support a hostile work environment claim. *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 05 Civ. 5109 (JCF), 2007 U.S. Dist. LEXIS 28274, at *58 (S.D.N.Y. Apr. 18, 2007) (rejecting claim of sexual harassment where a supervisor referred to females patients as "cunts", referred to a supervising nurse's "radical lesbian bullshit" and referred to a female patient as a "whore"), *aff'd*, 303 Fed. Appx. 943 (2d Cir. 2008); *Augustin v. Yale Club*,

28

03 Civ1924 (KMK), 2006 U.S. Dist. LEXIS 67462, at *66-67 (S.D.N.Y. Sept. 15, 2006) (finding

that while co-workers' comments that plaintiff was a "black bitch," "bitch," "garbage," and

"fucking negrita" were deplorable, they were insufficient as a matter of law to establish a hostile

work environment), *aff'd*, 274 Fed. Appx. 76 (2d Cir. 2008).  Instead, Joyce's alleged name-

calling of Plaintiff on two occasions after they were no longer on speaking terms, "suggests that

hostility arose out of a personality conflict between coworkers." *Silberfeld v. ABC Carpet Co.,*

*Inc.*, Index No. 104508/08, 2010 N.Y. Misc. LEXIS 1703, at *16 (Sup. Ct. N.Y. Cnty. Mar. 25,

2010) (repeated use of the term "bitch" was not sufficient to create an inference of discrimination

based on gender where evidence suggests that animosity existed between co-workers).

### C.   The Alleged Conduct Amounts to Petty Slights and Trivial Inconveniences

In *Wilson v. N.Y.P. Holdings, Inc.*, the court held that the following statements by a

plaintiff's *supervisors* over a period of six years did not "rise to the level of actionable

harassment" on the basis of sex or race:  "training females is like 'training dogs,'" "women need to

be horsewhipped," while alluding to plaintiff, 'I smell something. Whoff," and referring to "black

female celebrities as 'whores' and 'sluts' and female employees as 'girls.'"  2009 U.S. Dist.

LEXIS 28876, at *80-82.  The court not only dismissed the Title VII and NYSHRL claims, but

also the NYCHRL claims finding that "no construction of the NYCHRL, no matter how broad,

would compel a different result" because "no reasonable fact finder could conclude that the

alleged conduct amounts to more than [] petty slights and inconveniences." *Id.* at *82, 87-89.

In the wake of *Wilson*, where a *supervisor* made clearly sexist statements, Plaintiff

is hard-pressed to show that Sharoff's alleged comments, or Joyce's alleged comments, only a few

of which were gender-based, and most of which were directed at other individuals, sufficiently

state a claim for hostile work environment under the NYCHRL.  Again, while some of Joyce's

alleged statements may be offensive and may show that he disliked Plaintiff, the NYCHRL does

not "operate as a general civility code." *Williams*, 61 A.D.3d at 79 (citation omitted). *See also*

*Kaur*, 688 F. Supp. 2d at 328, 340 (dismissing NYCHRL claims where plaintiff alleged that co-

workers stated "We don't like foreigners," "[don't] like to work with Indians," plaintiff was

dangerous and belonged to the Taliban, and Indians "sell [their] daughters," and "never tell the

truth and lie" ).

## IV.

### PLAINTIFF'S RETALIATION CLAIMS FAIL

Courts use the *McDonnell-Douglas* burden shifting analysis to determine whether a

Plaintiff's retaliation claims survive summary judgment. *See Garcia*, 2007 U.S. Dist. LEXIS

71273, at *20. Plaintiff must show that she was engaged in "protected activity" and that she

suffered adverse employment actions *as a result* of reporting Joyce's conduct. *See Kaur*, 688

F. Supp. 2d at 335.

### A.   Merrill Did Not Retaliate Against Plaintiff

Plaintiff alleges that in retaliation for her "protected activity" Merrill decreased her

2007 discretionary bonus. (Britt Dep. at 580-82.) As discussed above, Plaintiff had already

learned her bonus amount prior to her conversation with Stewart. Therefore, the only "report" at

issue is her conversation with van der Ziel. Plaintiff's meeting with van der Ziel occurred on

January 7, 2008 and she learned of her bonus on January 10, 2008 (van der Ziel Dep. at 32, 47.)

However, it is undisputed that bonus amounts for Merrill employees, including Plaintiff, were

determined by early December 2007, before Plaintiff ever raised an allegation of discrimination,

and that Warble recommended Britt's bonus amount of $375,000 before it came to his attention in

early 2008 that Britt brought certain concerns to Human Resources. (van der Ziel Dep. at 51-52;

Warble Aff. ¶ 7.) Thus, Plaintiff's decreased bonus for 2007 could not possibly have been

affected by Plaintiff's report to van der Ziel.

**B.     Joyce Did Not Retaliate Against Plaintiff**

Plaintiff alleges that Joyce harassed her in retaliation for meeting with Stewart and van der Ziel. (Complaint ¶ 20.) Under both the city and state laws, Plaintiff must establish a causal connection between the protected activity and the adverse employment action. *See Kaur*, 688 F. Supp. 2d at 335 (granting summary judgment where plaintiff failed to link defendant's actions to a retaliatory motive). Here, *Joyce had absolutely no knowledge of Plaintiff's complaint to Merrill until the commencement of this litigation*; therefore, his alleged conduct is not causally related to her alleged "protected activity." (Joyce Decl. ¶ 6.) *See Panzarino*, 2009 U.S. Dist. LEXIS 101209, at *41 (dismissing claims where plaintiff had no evidence showing that her supervisor was aware of her activity prior to deciding to discharge her). Because plaintiff cannot establish a *prima facie* case of retaliation, her retaliation claims should be dismissed.

## V.

## PLAINTIFF'S CLAIM OF CONSTRUCTIVE DISCHARGE BASED ON HER GENDER MUST BE DENIED

The standard for a constructive discharge claim "is not easily met." *Arroyo v. WestLB Admin., Inc.*, 54 F. Supp. 2d 224, 231 (S.D.N.Y. 1999), *aff'd*, 213 F.3d 625 (2d Cir. 2000) (unpublished table decision). "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit voluntarily." *Nugent*, 2007 U.S. Dist. LEXIS 28274, at *44-45 (internal citations and quotation marks omitted). Plaintiff states that she resigned because:

> I couldn't take the hostility anymore. I couldn't tolerate it anymore. I was worn down. I was tired. I was told things weren't going to change. I was told my perception was poor. I was told that I wasn't in any position to ask for accounts. I was told that – it was an accumulation of things. I just couldn't take it anymore. I could not take it anymore.

(Britt Dep. at 545.) By "hostility," Plaintiff refers to (1) the alleged comments by Lynch and Mulholland, (2) her belief that she was resented by people, (3) her cross-evaluations and her

31

performance evaluations, and (4) Joyce's conduct. (Britt Dep. at 548.) Plaintiff admits that no

specific events occurred immediately prior to her departure. (Britt Dep. at 544.)

       The incidents she has identified do not support her constructive discharge claim.

First, the remarks attributed to Mulholland are not gender-based. (See *supra* at p. 25, n.15.)

Moreover, the stray remarks by Mulholland (in 2004) and Lynch (in 2005)[17] and the alleged

statements by Joyce while sitting next to Plaintiff (Fall 2005-Summer 2006) occurred years before

her resignation in 2008. Additionally, because Plaintiff has not provided any temporal link to the

events of early 2008, those remarks are not evidence of constructive termination due to her gender.

*Hayles v. Advanced Travel Mgmt. Corp.*, No. 01 Civ. 10017 (BSJ)(DFE), 2004 WL 26548, at *18

(S.D.N.Y. Jan. 5, 2004) (rejecting constructive termination claims because plaintiff could not

show discriminatory animus where supervisor's comments were not temporally linked to the

alleged constructive termination).

       Second, Plaintiff cannot link the alleged resentment she felt by co-workers to her

gender. While Plaintiff may have perceived resentment by co-workers and been frustrated with

her poor co-worker and manager performance evaluations and believed that they were inaccurate,

"[a]n employee's 'subjective perceptions' do not govern a claim of constructive discharge."

*Nugent*, 2007 U.S. Dist. LEXIS 28274 at *45 (stating that "plaintiff may not defeat summary

judgment by boosting her claim with 'vague, [un]supported allegations' that the work environment

was tense and unpleasant and that she suffered 'harassment.'") (*Id.* at 43) (citations omitted).

       Third, Plaintiff concedes that the individuals who evaluated her performance – by

both her cross evaluations and performance reviews – did not discriminate against her based on

her gender. (Britt Dep. at 436-39, 471-74, 349.)

---

[17] As set forth above at p. 25, n.15, the alleged harassment by these individuals is barred by the
three-year statute of limitations applicable to claims filed under the NYSHRL and NYCHRL.

Fourth, the alleged conduct by Joyce, her co-worker, in early 2008[18] does not constitute a hostile work environment and thus, by law, does not rise to the level of a constructive discharge. "Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Pa. State Police v. Suders*, 542 U.S. 129, 149 (2004); *Vazquez-Bonilla v. United Union of Roofers Local 8*, No. 08-CV-0101(RRM)(LB), 2010 WL 1005905, at *8 (E.D.N.Y. Mar. 17, 2010) (dismissing constructive discharge claims based finding of no hostile work environment). Because Plaintiff has not made out a retaliatory hostile work environment claim or a gender-based hostile work environment claim, her constructive discharge claim must be denied. *Nugent*, 2007 U.S. Dist. LEXIS 28274 at *46 (rejecting constructive discharge claim where Plaintiff failed to show retaliatory or gender-based hostile work environment).

Finally, in order to state a claim for constructive discharge, the plaintiff "must show deliberate action on the part of the employer . . . . Something beyond mere negligence or ineffectiveness is required." *Id.* at *45-46 (dismissing constructive discharge claim where Plaintiff could not show that "she was forced to resign"). However, Plaintiff admits that van der Ziel and Stewart told her that Merrill did not want her to resign. (Britt Dep. at 529-30, 533-34; van der Ziel Dep. at 56.) Plaintiff cannot show that Merrill took a deliberate action to force her to quit – indeed, all of the evidence, including Plaintiff's own testimony, indicates that Merrill wanted her to continue her employment. Thus, Plaintiff cannot make a claim for constructive discharge.

---

[18] Plaintiff alleges that in early 2008, Joyce told her to "shut the fuck up" six times, called her a "cunt" twice, rolled his eyes at her when she said something incorrectly, criticized her, and tapped his watch. (Britt Dep. at 534-37.)

## Conclusion

For the foregoing reasons, Merrill respectfully requests that the Court dismiss the

Complaint in its entirely and grant such other and further relief as the Court may deem just and

proper.

Dated: New York, New York
      December 17, 2010

            KRAMER LEVIN NAFTALIS & FRANKEL LLP

            By:_____/s/ Kevin B. Leblang_____
                Kevin B. Leblang (kleblang@kramerlevin.com)
                Izabel P. McDonald (imcdonald@kramerlevin.com)
                Katrina L. Baker (kbaker@kramerlevin.com)
            1177 Avenue of the Americas
            New York, New York 10036
            (212) 715-9100

            ***Attorneys for the Merrill Defendants***
            Merrill Lynch & Co., Inc. and
            Merrill Lynch, Pierce, Fenner & Smith Incorporated